[Crim. No. 4299. First Dist., Div. One. Jan. 22, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. SAMUEL ALBERT NELSON, Defendant and Appellant.

David E. Nelson, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Michael R. Marron, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—On July 20, 1962, defendants Samuel Albert Nelson and Elton Green were charged in an information with the robbery of one Fred Wellman on or about June 17, 1962. (Pen. Code, § 211.) It was also charged therein that at the time of the commission of the offense Nelson was armed with a deadly weapon, to wit, a pistol. On August 3, 1962, defendant Nelson entered a plea of not guilty to the offense charged.

On August-17, 1962, an amended information was filed

against defendants charging them with two counts of robbery. Count one, repeating the allegations of the original information, charged defendants with the robbery of Wellman and in addition alleged one prior felony conviction against Nelson and two such convictions against Green. Count two charged defendants with the robbery of one Regis Foss at the Regent Service Station on or about May 31, 1962. It was also charged that at the time of the commission of the offense each defendant was armed with a deadly weapon, to wit, a pistol. The same prior convictions as in count one were realleged.

Defendants were convicted by a jury of robbery of the first degree on both counts, the jury finding that defendant Nelson was armed with a deadly weapon at the time of the commission of each of the offenses. Defendant Nelson alone appeals from the judgment.

Since defendant[1] does not question the sufficiency of the evidence to support the verdict, our recital of the facts will be limited to those necessary for a proper consideration of the issues before us. As will appear, some of the facts will be set forth *infra* in connection with our discussion of the respective issues to which they relate. We will also discuss the robberies in chronological order.

On May 31, 1962, at about 1 a.m. two men, later identified as defendant and Green, walked into the Regent Service Station in San Jose. They went up to Regis Foss, the attendant on duty, who was in a small shack and alone in the station. Defendant bought a pack of cigarettes; he and Green then went to the restroom; they then returned to Foss for matches. Defendant thereupon pulled a gun and demanded money. Foss gave him about $75 from the cash register. The men then shut Foss in the restroom. A few minutes later, Foss came out and called the police. Afterwards he noticed that $50 to $60 worth of cigarettes which were kept in cartons near the cash register were missing.

Foss identified defendant as one of the robbers in a police lineup at Santa Rita Prison Farm in Alameda County, where Nelson was being held after an arrest in Oakland as we will later explain. Foss also identified both defendant and Green at the preliminary hearing and at the trial.

---

[1] Our reference hereafter to defendant means the defendant-appellant Nelson. We will refer to his codefendant, not an appellant herein, as Green.

On June 17, 1962, at 12:30 a. m., two men later identified as defendant and Green entered the Speedee Mart market in San Jose, selected some items for purchase and stood in line at the check stand. One Fred Wellman, a grocery clerk, was the sole person on duty at the check stand. Wellman rang up the items on the cash register, received two one-dollar bills from defendant and proceeded to return the change. He dropped some of the change on the floor. After he picked it up, defendant gripped his hand hard so as to make him drop more coins. When Wellman reached down, defendant produced a gun and held it under the counter, pointed at Wellman's face. He said: "This is a holdup." At defendant's order, Wellman waited on another customer who remained unaware of what was transpiring. He then emptied the contents of two tills into a paper bag which he placed on the counter next to the bag of groceries. Defendant picked up both bags whereupon he and Green left the market. Wellman called the police. He estimated that the robbers took about $250.

On June 28 or June 29 Sergeants McKay and Petersen of the San Jose Police Department showed Wellman about 12 photographs from which he identified defendant and Green. On July 9 the officers took Wellman to the Santa Rita Prison Farm where he again identified defendant. Wellman also made a positive identification of defendant and Green at the trial.

At this point, we pick up an intervening event in our narrative. On June 27, 1962, at about 1:30 a.m. defendant and Green were apprehended in a Standard Service Station in Oakland. Officers Borges and Trestler of the Oakland Police Department saw the pair walking into the station and followed them in the patrol car.[2] As the officers drove in, the two men went into the restroom. When they came out, the officers checked their identifications and also checked the restroom where they found a revolver in a waste can lying on top of the waste paper. This was later identified as a .38-caliber revolver with four bullets in the gun, one of which was under the hammer. A search of the restroom, made a short time afterward, uncovered a 7.65-millimeter automatic pistol with one shell in the chamber and six in the clip. Defendant later admitted to Borges that both weapons were his, that he carried them for protection and that he had

[2]Borges was on the lookout for a pair of coveralls and observed that one of the men had on a pair of dark blue coveralls.

cached them in the restroom because he did not want to be caught by the police with a gun, presumably because he was a convicted felon.

At the trial photographs of portions of the restroom showing the two guns as they were found therein were admitted in evidence without objection. However the two guns themselves together with their shells were received in evidence over defendant's objection.

In addition to Wellman, Foss, Oakland police officers Borges and Trestler, and several technicians, the prosecution called Sergent Petersen of the San Jose Police Department. Petersen testified that on July 10, 1962, at the Santa Rita Prison Farm, after he and Sergeant McKay had confronted defendant with the fact that he had been identified in the police lineup on the previous day, defendant confessed first to the Speedee Mart robbery and finally to the Regent Service Station robbery. Prior to this testimony, the court conducted a preliminary hearing out of the presence of the jury and in chambers during which the trial judge heard testimony from both police officers and from defendant on the issue of the voluntariness of defendant's statements, as we discuss in detail *infra*. Suffice it to say at this point that, at the conclusion of such hearing, the court overruled defendant's objection to the introduction of his statement made at the Santa Rita Prison Farm and, as we have said, such statement was testified to before the jury by Sergeant Petersen and thus received in evidence.

Neither defendant nor Green took the stand in his own behalf. The defense called three witnesses who had been in or near the Speedee Mart at the time of the robbery but were unable to identify either defendant or Green.

Defendant contends here that: (1) the court committed prejudicial error in admitting his confession into evidence because the confession was induced by promises of leniency; (2) the prosecutor was guilty of prejudicial misconduct; and (3) the court committed prejudicial error in admitting in evidence the two guns and ammunition.

At the hearing conducted in chambers the People called Sergeant McKay who testified that he and Sergeant Petersen had first talked to defendant briefly on July 9, 1962, at the time of the lineup at Santa Rita. Both officers then returned on July 10, 1962, when they spoke to him about the two San Jose robberies. According to McKay no threats or promises

were made to defendant prior to talking to him about the robberies.

McKay on *voir dire* examination by defense counsel thereupon testified that in the course of the above conversation at Santa Rita, defendant admitted to McKay and Petersen committing the two San Jose robberies at the Regent Service Station and the Speedee Mart market and also committing two robberies outside of San Jose. Defendant made such confessions after the officers had been talking to him for possibly an hour "getting his background, the story about his arrest." McKay denied that he indicated to defendant prior to the confession that if the latter "would confess to this one or these two or clean them all up," McKay would see that "it was easier on him." McKay then testified: "Q. Did you indicate *at that time* that *if he would plead to that you could get whatever they had pending in Oakland dropped,* or something to that general effect? A. Well, *to explain that, we told him generally, if a man was charged with a robbery,* the charge, *the weapon charge* that he had against him in Oakland *would be dropped,* and that's the way we wanted to proceed with it. Q. Did you tell him which was the lesser charge of the two? A. Of the two? Q. Yes. Did you tell him? A. No, I don't believe I did tell him that the weapon charge would be lesser. Q. Did you indicate to him *on that time before his confession* that you would try and get any of them dropped? A. Any what dropped? Q. Any charges against him, *any other charges?* A. No. *The only charge that we dropped, or talked about, was this weapon charge* that he had against him there in Oakland at that time. He hadn't—I don't know whether he had a Preliminary Hearing on it yet, or he hadn't had a hearing on it. Q. Did you give him any inducements at that time to confess, any reason why he should? A. Other than to just to get him straightened out, so he could get himself straightened out, that's all." (Italics added.)

McKay denied that a complaint was issued for only one of the San Jose robberies although Nelson had confessed to both, because of an agreement entered into by the officers and Nelson before the latter confessed. He explained that they did not have any statement or admissions from Green and therefore "thought we could do better with Green if we just tried one job rather than try for two, so that's why we charged him with just one job."

On the resumption of direct examination by the prosecu-

tion, McKay testified that he and Petersen had first told defendant that he had been identified as one of the persons involved in the San Jose robberies; that defendant then admitted to having been convicted of burglary in Georgia and in addition to having been a parole violator; and that he, McKay, then thought that defendant could be appealed to "straighten himself out."[3] McKay further stated that prior to defendant's confession to the San Jose robberies the officers did not discuss with him at all the question of charging him with one or both of the robberies. Nor did they have any conversation with defendant prior to his confession relative to dropping a certain weapons charge then pending against him in Oakland.[4] McKay's pertinent testimony is as follows: "Q. All right. Then the other thing, *before he admitted these four here in Santa Rita,* or the two here, the four all together, or whatever it was, *was there a conversation relating to dropping the weapons charge* that they had up there in Oakland? A. *No. The situation about the weapons charge didn't come up until after he had talked and given us the jobs.* Then he wanted to know what was going to happen to the weapons charge. ... Q. All right. Now, let me ask you this: After the confession up there, did you make any deal with him to charge him with one if he pled to the one, instead of going to trial, or anything of that kind? By after, I mean

[3]McKay testified: "[A]nd from getting the answers to these questions [relative to defendant's criminal and employment history] I felt that he possibly would be a subject that we could appeal to on getting himself straightened out, relying on the truth, making the truth work for him, and words to that effect, if he was going to do himself any good, he was going to do it by the truth and nothing else, he was identified on these robberies and we could convict him. Q. Okay. Do you recall anything else about straightening himself out at that conversation other than what you've told us at that time? A. Oh, other than possibly appealing to the fact that a criminal life wasn't rewarding, he had nothing to gain by being a criminal, *if he would rely on the truth it would help him.* Q. *It would help him in what way; that's what we're getting at?* A. *Well, it would help him get straightened out, he would take the side of truth,* he would *get out of the criminal picture;* if he relied on the truth, he had a better chance of rehabilitating himself; if he was going to lie and keep stealing, and the rest of it, he would never get straightened out, and he could spend his whole life in crime; if he was going to make the move to be right and to get straightened out, this was the time to do it, to rely on the truth." (Italics added.)

[4]This presumably refers to defendant's arrest at the Standard Service Station in Oakland on July 27, 1962, and to a charge against him as a person convicted of a felony of unlawfully carrying concealed weapons.

between the time he made the confession and the time you charged him, actually charged him? A. No. Q. Did that subject come up later with him at any time? A. Yes, it did, yes. Q. In some of these later conversations? A. Yes, later conversations.'' (Italics added.)

As the last two answers indicate and as the People frankly concede in their brief, the two officers did offer inducements to defendant and Green on occasions subsequent to July 10, 1962, in order to obtain confessions to other unsolved robberies. Originally the prosecution planned to offer in evidence tape recordings made without the knowledge of the defendants of certain conversations between them on July 13, 1962, and also of a statement given by both men in which they jointly confessed to having robbed the Speedee Mart market. At the conclusion of McKay's testimony in chambers, therefore, the prosecution announced that it would not offer any statements or confessions of either defendant subsequent to Nelson's confession made at Santa Rita on July 10, 1962, and that the only confession attempted to be introduced was Nelson's oral confession of that date.

Defendant thereupon called Sergeant Petersen as a witness in such proceedings outside the presence of the jury. Petersen testified, *inter alia,* as follows: ''Q. Did you discuss any of the other crimes *before you [sic] confessed to the Speedee Mart; did you even talk about it on the 10th?* A. *The only other crime I think we talked about was the charges they had against him in Oakland,* on carrying a concealed weapon when he was arrested. Q. You said that *you would see that that would be dropped,* you would see to it, right, *if he confessed to the Speedee Mart?* A. *No, I didn't say that.* Q. Did you say that in effect ? A. No. Q. Now what did you say with regard to the Oakland one? A. As far as the job, I don't think I said anything about it, I think Sergeant McKay did the talking about that particular job. Q. What did he say? A. He said something to the effect that 'as far as the deal up here in Oakland with the guns, we don't know what they're going to do about that job, but normally if you're charged with a robbery in another county, they'll automatically give us, they'll give you to us for the prosecution of the robbery, the bigger crime.' Q. Well, what was it that induced the reluctant Mr. Nelson after a period of time to confess to you on the 10th of July? A. I don't know what made him confess to us, I haven't any idea. He should know. Q. *Didn't you offer him some inducements?* A. *No.* The only thing that

was offered to him, it was nothing offered to him. *We appealed to him to tell the truth,* and *if he wanted to get straightened out the only way to do now is to start telling the truth,* and convinced him that he had been identified by two victims of the robberies here in San Jose.'' (Italics added.)

McKay was then recalled for cross-examination by defense counsel. He denied that when he appealed to defendant to get ''straightened out'' he was in fact indicating to him that, if defendant confessed to the Speedee Mart robbery or any one of the charges, he, McKay, would see what he could do to drop ''these others.'' McKay then testified: ''Q. Didn't you indicate to him that you would do what you could to get these others, to get his time—A. After? Q. *No, before he confessed?* A. *No.* Q. That's about all you were concerned with? A. *All we talked about before he gave this statement was getting himself straightened out.''* (Italics added.)

Defendant thereupon testified in such proceedings that on July 10, 1962, before he made any statement to McKay and Petersen about the Speedee Mart robbery, the two officers told him that the Oakland weapons charge would definitely be dropped if he confessed to such robbery. He denied however that he ever confessed on such occasion to the robbery of the Regent Service Station.

As we have already indicated, the court at the conclusion of the proceedings in chambers overruled defendant's objection to the introduction in evidence of his statements made to the two officers on July 10, 1962, at Santa Rita. Sergeant Petersen thereafter testified to such statements before the jury.

Defendant now claims that the testimony of both McKay and Petersen in chambers, particularly that portion quoted by us above, clearly indicates that defendant was induced to confess on July 10, 1962, to the two San Jose robberies by direct and implied promises of leniency.

██ ''Before a confession may be used against a defendant the prosecution has the burden of showing that it was voluntary and was not the result of any form of compulsion or promise of reward, and it is immaterial whether the pressure or inducement was physical or mental and whether it was express or implied. [Citations.] ██ The use in a criminal prosecution of involuntary confessions constitutes a denial of due process of law under both the federal and state Constitutions. [Citations.]

██ ''It is the duty of a reviewing court to examine the

uncontradicted facts in order to determine independently whether a confession was voluntary. [Citations.]'' (*People v. Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].)

As the court said in *People v. Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845]: ''The cases in this court are clear from the earliest time that any promise made by an officer or person in authority, express or clearly implied, of leniency or advantage for the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law. (*People v. Johnson,* 41 Cal. 452, 454, 'if they would come in and confess that it would be lighter with them'; *People v. Barric,* 49 Cal. 342, 344-345, 'it would be better for him to make a full disclosure'; *People v. Thompson,* 84 Cal. 598, 605-606 [24 P. 384], 'it would be better for him to tell what he knew'; *People v. Gonzales,* 136 Cal. 666, 668 [69 P. 487], 'the sheriff would do whatever he could for him, and ... ''that he had better come out and tell the truth'' '; see also *People v. Loper,* 159 Cal. 6, 15-18 [112 P. 720, Ann. Cas. 1912B 1193]; *People v. Leavitt,* 100 Cal.App. 93, 94-95 [279 P. 1056].) It is now settled that the same test must be applied to all incriminating statements whether they be confessions in the strict sense or only admissions. (*People v. Atchley,* 53 Cal.2d 160, 169-170 [346 P.2d 764].) [Footnote omitted.]''

Defendant first claims that *prior* to his confession the two officers indicated to him that the Oakland weapons charge would be dropped if he were to be charged with the Speedee Mart robbery. These statements, defendant argues, constitued the inducement for his oral confession. The People concede that both officers discussed with defendant the probability that the Oakland weapons charge against him would be dropped if he were charged with robbery but argue that any such discussion took place *after* defendant had confessed to the two San Jose robberies.

Some of McKay's testimony on this pivotal matter is not unequivocal and standing alone might be susceptible of the construction that the dropping of the weapons charge *had* been discussed *before* the confession. (See italicized portion quoted *supra.*) Thus when defense counsel first inquired whether McKay indicated ''at that time'' that if defendant ''would plead'' McKay could get the Oakland charges dropped, it is not clear that defendant's counsel was speaking

of a time *before* the confession. The phrase "at that time" refers obviously to the date "the 10th" in a preceding question, but does not specify the particular point of time, that is, before or after the confession. Even if it be construed as referring to a point of time *before* the confession, it is not clear that McKay was speaking as of the same point of time. McKay's answer is not directly responsive ("Well, to explain that, we told him generally, ...") indicates some attempt to qualify the response and clearly has no reference to a specific point of time on July 10th.

Three questions later, the witness was asked if he indicated to defendant "before his confession" that he would try to get "any other charges" dropped. To this he gave a negative answer but added that "[t]he only charge that we dropped, or talked about, was this weapon charge...." This volunteer statement, containing no time reference itself, could be construed to refer to the point of time posited by counsel (i.e., before the confession) or to the period of the entire interview. It is notable that in answer to the next question, McKay stated that he gave defendant no inducements "[o]ther than to just get him straightened out, so he could get himself straightened out, ..."

With respect to Sergeant Petersen's testimony in chambers, it is again not clear that both the questioner (defendant's counsel) and the witness were speaking with reference to the same point of time. Although defense counsel began by asking Petersen if he discussed "any of the other crimes" before the confession to the Speedee Mart robbery, he then added in the same question: "[D]id you even talk about it on the 10th?" Petersen then responded that the only other crime talked about was the weapons charge. It is not clear whether he is speaking as to the point of time indicated in the first part of the question or in the second part of the question. Nor does Petersen indicate any point of time in giving, in response to subsequent questions, his version of what McKay said to defendant.

In our view the net effect of the foregoing testimony of both officers was that the Oakland weapons charge was *not* discussed *prior* to defendant's confession. We conclude that this appears without intrinsic contradiction in their testimony, that their statements that they offered no inducements to defendant stand unqualified, and that contrary to defendant's claim the discussion of the Oakland weapons charge coming after the confession did not induce it. The officers'

testimony was of course contradicted by defendant himself.
■ However, the resolution by the trial court of this factual conflict against defendant is not subject to attack on appeal. (*People* v. *Rodriguez* (1959) 168 Cal.App.2d 452, 460-461 [336 P.2d 266], cert. denied 361 U.S. 843 [80 S.Ct. 96, 4 L.Ed.2d 82].)

It does appear from the testimony of both officers, and the People here concede, that *prior* to the confession McKay made statements to defendant to the effect that he should get himself straightened out by telling the truth. (See testimony *supra,* including footnote 3, *ante.*) Defendant also claims that these statements amounted to a "clear implication that Appellant would receive more favorable treatment if he told the 'truth,' " and that they therefore vitiated the voluntariness of his oral confession.

It has been held in a number of California cases that advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary. (*People* v. *Haney* (1920) 46 Cal.App. 317, 322-323 [189 P. 338], " 'the truth would not hurt him, and he better come out and tell it; that they expected him to tell the truth' "; *People* v. *O'Brien* (1921) 53 Cal.App. 754, 755 [200 P. 766], "to tell the truth and that he 'might as well make a clean breast of it' "; *People* v. *Brandon* (1933) 134 Cal.App. 550, 551 [25 P.2d 485], "that if he wished to talk it would be best for him to tell the truth"; *People* v. *Cowling* (1935) 6 Cal.App.2d 466, 470-471 [44 P.2d 441], " 'if you come clean, it will be better for you, or words to that effect' "; see also *People* v. *Castello* (1924) 194 Cal. 595, 598 [229 P. 855] (overruled on other grounds in *People* v. *Ditson,* 57 Cal.2d 415, 440 [20 Cal.Rptr. 165, 369 P.2d 714]), " ' We told them we had the goods on them and that they had just as well come clean' "; *People* v. *Ditson* (1962) 57 Cal.2d 415, 432 [20 Cal.Rptr. 165, 369 P.2d 714], footnote 5 (petition for writ of cert. dismissed 371 U.S. 937 [83 S.Ct. 311, 9 L.Ed.2d 273]), " 'I'm not telling you I'm going to help you. I'm not promising you anything. I'm telling you, Carlos, help yourself. ... Don't you see what I'm trying to do for you? ... I want you to help yourself. I'm not promising you anything. ...' "; see generally 3 Wigmore on Evidence (3d ed.) § 832.)

■ On the other hand if the advice or exhortation to tell the truth is couched in language expressly or impliedly im-

porting a threat or a promise of leniency or favorable treatment and thus becomes a motivating cause of the subsequent confession, the confession is involuntary. (*People* v. *Johnson* (1871) 41 Cal. 452, 454, ''I think I told them there was no use fooling about it; they may as well confess, as there was evidence enough to convict them; I think I told them that if they would come in and confess that it would be lighter with them; I made the proposition before they told me about the grain''; *People* v. *Barric* (1874) 49 Cal. 342, 344-345, ''it would be better for him to make a full disclosure''; *People* v. *Thompson* (1890) 84 Cal. 598, 605-606 [24 P. 384], '' 'I told him that I didn't think the truth would hurt anybody. It would be better for him to come out and tell all he knew about it if he felt that way' ''; *People* v. *Gonzales* (1902) 136 Cal. 666, 668 [69 P. 487], ''[h]e was assured by the sheriff that if he spoke the truth the sheriff would do whatever he could for him, and was told 'that he had better come out and tell the truth' ''; *People* v. *Leavitt* (1929) 100 Cal.App. 93, 94 [279 P. 1056], ''it would 'be much better for him' to make a confession''; 3 Wigmore, *op. cit.*, § 835 et seq.)

In the light of the above authorities and under all the circumstances of the instant case, we are of the view that the statements made to defendant relevant to straightening himself out and telling the truth did not vitiate the free and voluntary character of his confession. We do not believe that they proceeded beyond the permissible limits of exhortations or advice ''to tell the truth.'' While McKay did tell the defendant that if the latter ''would rely on the truth it would help him,'' his following statement clearly precludes any implication of leniency or favorable treatment at the hands of the authorities (see footnote 3, *ante*). This additional testimony discloses that the advantages which the officers indicated would be gained by the accused by telling the truth did not consist of lenient police treatment but existed only in the sphere of defendant's moral rehabilitation. Petersen testified that he and McKay offered no inducements: ''We *appealed* to him to tell the truth, . . .'' (italics added). The statements of the officers on this point, taken as a whole, represent no more than exhortations without threat or promise. We therefore conclude that defendant's confession was free and voluntary. Contrary to defendant's claim, it was therefore not rendered inadmissible by interrogations and statements of the officers which came *after* the oral confession and could not therefore constitute induce-

ments for it. (*People* v. *Lindsey* (1961) 188 Cal.App.2d 471, 476-477 [10 Cal.Rptr. 488].)

We turn to consider defendant's second contention that the prosecutor was guilty of prejudicial misconduct. Three instances are cited to us: (1) the prosecutor's assertion in his opening statement that defendant's confession to the two robberies would be introduced into evidence; (2) the prosecutor's reference in the presence of the jury to "statements" made by defendant prior to going into chambers to determine the question of their admissibility; and (3) the impugning of the good faith and professional conduct of counsel for defendant by inferring that he had suppressed evidence and tampered with the witness.

As to the first instance, defendant has not brought before us the prosecutor's opening statement although the instant record does disclose that during the proceedings in chambers on the confession, the prosecutor acknowledged that he had told the jury in his opening statement that defendant had admitted the two San Jose robberies. While the fact of the statement thus appears established, we remain in ignorance, in the absence of a record, as to exactly what was said. Nowhere is it disclosed whether and in what manner defendant entered any objection to the statement. Without citation of any case, defendant argues that such a reference to the confession is improper before its admissibility is passed on by the court and the subsequent opportunity for defendant to attack the admissibility of the confession does not overcome the prejudicial effect of having the jury view the evidence in the light of the reference to the confession.

The rule is that in an opening statement it is the duty of counsel to state the facts fairly and to refrain from referring to facts which he cannot or will not be permitted to prove. (*People* v. *Planagan* (1944) 65 Cal.App.2d 371, 406-407 [150 P.2d 927]; *People* v. *Chester* (1956) 142 Cal.App.2d 567, 574 [298 P.2d 695].) In a criminal case, the sole purpose of an opening statement by the People is to outline what the prosecution intends to prove, and of an opening statement by the defense to outline the facts upon which an acquittal will be sought. (*People* v. *Stoll* (1904) 143 Cal. 689, 693 [77 P. 818]; *People* v. *Planagan, supra.*) Subsequent failure of the prosecutor to secure the introduction into evidence of what he claimed he would prove does not necessarily indicate prejudice particularly in the absence of a showing of bad faith. (*People* v. *Planagan, supra; People* v.

*Andrus* (1958) 159 Cal.App.2d 673, 680 [324 P.2d 617];
*People* v. *Carr* (1958) 163 Cal.App.2d 568, 575 [329 P.2d
746].) "It is the substance and implication of a statement, or
the effect of an act which determines what the law recognizes
as prejudicial misconduct." (*People* v. *Planagan, supra,* at
p. 407.) *Carr* summarizes the applicable rule thus: "It is
well settled that the opening statement of the deputy district
attorney will furnish ground for an assignment of prejudi-
cial misconduct only in exceptional cases—some involve lack
of good faith or a deliberate attempt to misstate the evidence
[citations], and some disclose such flagrantly improper con-
duct as to work a legal prejudice to the defendant. [Cita-
tion.]" (Pp. 574-575.)

 In the instant case there was no lack of good faith
on the prosecutor's part much less any deliberate attempt to
misstate what he claimed he could prove. When he told the
jury that he would prove that the defendant had confessed,
he did possess such evidence only part of which the trial
judge indicated he would exclude and which the prosecutor
then declined to offer. In view of our previous conclusion that
the oral confession was free and voluntary and therefore
properly admitted, we are satisfied that the prosecution acted
in good faith and that no misconduct resulted. (*People* v.
*Siemsen* (1908) 153 Cal. 387, 398 [95 P. 863]; *People* v.
*Carr, supra.*)

 As to the second specification of misconduct, the
record discloses the following statement by the prosecutor:
"MR. HOFFMAN [Deputy District Attorney]: Your Honor
please, we're at a stage in the case where we were going to
call the police officers relative to statements and I think
counsel and I both agreed we wanted to present matters to
the Court, and I think that's a proper way on statements.
The Court must review the matter first, and only then, de-
pending on the Court's reviewing, let it go to the jury, so I
think perhaps, since McKay is next, we might as well do that
now." Counsel for defendant objected to this remark and
later made it the basis of a motion for a mistrial which was
denied.

Defendant cites no authority supportive of his position
that the above statement is misconduct. Contrary to his claim
made here that the prosecutor referred to statements *by de-
fendant,* it is quite apparent that the remarks objected to did
not specify to whom the "statements" were to be attributed
or the nature of their contents. Neither defendant's name

nor that of his codefendant Green was mentioned. We doubt that the jury would have such a knowledge of the procedure then being initiated of presenting certain preliminary matters to the judge out of their presence that they could have construed these general remarks as a reference to a confession of defendant.

It is urged that because the prosecutor spoke of "statements" in the plural, his remarks of necessity included other statements and admissions later held inadmissible by the court. We are not impressed with this argument since the jury could not possibly know that there were other statements. If they attached any significance to the plural usage (assuming that they connected the word with defendant and Green) it is more reasonable to assume that they regarded it as a reference to both robberies. We find no misconduct in the incident.

The third specification of misconduct, occurring on redirect examination of Sergeant Petersen, arose from the officer's testimony that the defense witness Mrs. Green in her inability to identify the robbers of the Speedee Mart market demonstrated "quite a change in her attitude." The following then appears in the testimony: "Q. All right. Now, in the time when that change in attitude took place from the time when you first talked to Mrs. Green, she apparently thought she could identify them. When you later talked to her and she said she was too far away, she didn't know who did it, in the interim did you give Mr. Fitzsimmons that address; was that in between those two times that you gave them her address? A. I'm not sure, I don't remember."

As the prosecutor concluded such redirect examination, the following took place: "MR. HOFFMAN [Deputy District Attorney]: Thank you. I don't have anything else. MR. FITZSIMMONS [Defense Counsel]: Well, that was quite a nifty implication. MR. HOFFMAN: Yes, it was, Counsel. As a matter of fact, it happened to be the fact. There was a big change in attitude about the time you got in the picture."

Defendant made no objection to these remarks, did not assign them as misconduct, and made no request of the trial court to instruct the jury to disregard them. While the prosecutor's insinuation of tampering with a witness was clearly improper, defendant may not now complain. As a general rule where no objection or assignment of error is made in the trial court, the claim of misconduct of the prosecutor cannot be raised for the first time on appeal. (*People* v.

*Wein* (1958) 50 Cal.2d 383, 396 [326 P.2d 457], cert. denied 358 U.S. 866 [79 S.Ct. 98, 3 L.Ed.2d 99] ; *People* v. *Hampton* (1956) 47 Cal.2d 239, 241 [302 P.2d 300] ; *People* v. *Byrd* (1954) 42 Cal.2d 200, 208 [266 P.2d 505] ;[5] *People* v. *Codina* (1947) 30 Cal.2d 356, 362 [181 P.2d 881] ; *People* v. *Berryman* (1936) 6 Cal.2d 331, 337 [57 P.2d 136 ].) This is not a case falling within either of the exceptions to the general rule set forth in *People* v. *Berryman, supra*: that is, a case where the evidence was so closely balanced, presenting grave doubt as to defendant's guilt, that the prosecutor's remarks materially affected the outcome (see also *People* v. *Fleming* (1913) 166 Cal. 357, 381 [136 P. 291, Ann.Cas. 1915B 881]) or a case where any possible harmful effect of the comment could not have been obviated by a timely admonition to the jury. (See also *People* v. *Kirkes* (1952) 39 Cal.2d 719, 726-727 [249 P.2d 1].)

Anent the first exception stated in *Berryman,* defendant was identified by both robbery victims and confessed to both robberies. In respect to the second exception, subsequent redirect examination of Petersen established that defendant's counsel was not connected with the case prior to the "change in attitude" on the part of the witness Mrs. Green so that the improper insinuation previously made was removed.[6]

Finally we consider defendant's claim that the court committed prejudicial error in admitting in evidence the .38-caliber revolver and the automatic pistol, along with a clip and bullets.

The applicable rule, as defendant acknowledges, is stated in *People* v. *Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1] : "When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon.

[5] Cert. denied 348 U.S. 848 [75 S.Ct. 73, 99 L.Ed. 668]; overruled on other grounds in *People* v. *Green* (1956) 47 Cal.2d 209, 232 [302 P.2d 307].

[6] On redirect examination by the prosecutor, the following testimony was subsequently given: "Q. So to clear it all up, there's no question but what Mr. Fitzsimmons couldn't have been appointed till after July 11th? A. Correct. Q. All right, and if we showed pictures to Mrs. Green on the 2nd, obviously any calls you had with him could not have been until after you showed the pictures the second time to Mrs. Green? A. That's correct."

[Citations.] When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons. [Citations.]''

 In the instant case the specific type of weapon used in the crime was not known nor did the prosecution rely on a specific type of weapon. Foss, the victim in the Regent Service Station robbery, testified that the robber's gun ''looked black and it was a revolver, and I couldn't tell too much about it since his hand was mostly covering the gun.'' At the trial after the .38-caliber revolver had been marked for identification and shown to him, Foss stated: ''Well, yes, its similar. It's the same color, and it's got that rounded here'' (referring to the cylinder). He said '' [t]hat looks like the gun'' but was not able to positively identify it. Wellman, the victim of the Speedee Mart robbery, did not testify to a specific type of weapon. He stated: ''I'm not familiar with caliber of pistols. I estimated it at that because a .32 and a .22 is a small-caliber pistol.'' He also testifed that the weapon was ''a revolver-type pistol'' and that the bullets in it were ''shiny, copper-type.'' Since each victim testified that a revolver type weapon had been used in the respective robbery, the admission of the .38-caliber revolver and the bullets taken from such weapon was not error. (Code Civ. Proc., § 1954; *People* v. *Riser, supra*; *People* v. *Beltowski* (1945) 71 Cal.App.2d 18, 23 [162 P.2d 59]; *People* v. *Nichols* (1959) 171 Cal.App.2d 320, 325 [340 P.2d 727].) It was error however to admit in evidence the automatic pistol, together with its clip and shell, which was not stated by any witness to be similar to any weapon observed in the perpetration of either robbery. Nevertheless, defendant was not prejudiced thereby. After an examination of the entire cause, including the evidence, we cannot say that it is reasonably probable that a result more favorable to defendant would have been reached in the absence of the above error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The judgment is affirmed.

Bray, P. J., and Molinari, J., concurred.