[Crim. No. 18069. Second Dist., Div. Five. Jan. 5, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILLIP JAMES HURLIC, Defendant and Appellant.

## COUNSEL

Harry E. Weiss for Defendant and Appellant,

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Lawrence P. Scherb II, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant, who at the time of the commission of the offense was only 17 years old, appeals from a conviction of murder in the first

degree. A second count, charging a like offense, was dismissed at the time of sentence.[1]

The dead bodies of Mr. and Mrs. Diosdado were found by Mrs. Diosdado's brother at their feed store on December 19, 1968. The cash register drawer was open and empty. There were some coins on the floor.

Apart from this evidence of the corpus delicti, the record contains nothing but defendant's confession. It is the admissibility of that confession which is the only point on appeal.

At 5 p.m. on February 13, 1969, defendant was arrested for disorderly conduct.[2] He appeared intoxicated. At about 11:30 a.m. the next morning defendant was interrogated by Officer Armstrong. The officer told defendant that he had received information that defendant and one Bozzie Burton had been involved in the shooting of two people on December 19 at Greenleaf and Wilmington—apparently the address of the feed store. He told defendant "exactly" what information he had received.[3] The officer then read defendant's *Miranda* rights from a card. After each of the four rights was read to defendant, he "indicated" or "acknowledged" that he understood, but the officer could not recall whether he did so verbally or by nodding. The officer then asked: "And having these rights in mind, do you wish to talk to us now about the allegation?" Defendant stated that he would talk to the officer.

After giving defendant his constitutional rights, Armstrong then told defendant that Burton had accused him of shooting the two victims. Defendant said: "No, I didn't do it. It didn't go like that." Armstrong replied: "Well that's the way it was told to me. I don't see why you should take the blame if someone did say that you did shoot him. Well, give me

---

[1]The minute order reciting the proceedings for the court session at which count II was dismissed do not reflect the dismissal, although the reporter's transcript does. See final disposition.

[2]According to the probation report defendant had then just passed his 18th birthday. That fact was not before the trial court, but defendant's appearance was. Defendant's age at the time of the offense was covered by stipulation.

[3]The record is in some confusion concerning what Armstrong told defendant before and what he told him after he advised him of his constitutional rights. On direct examination Armstrong testified once as related in the text and again, one page later, that before advising defendant of his rights he told him that he was the "suspect who had shot two people in a feed store. . . ." On cross-examination Armstrong testified that he told defendant that he was investigating an incident which he "wanted to talk to him about" after the *Miranda* warning. In his very next answer, however, he reversed the sequence. A little later, however, he testified that the statement to the effect that defendant's accomplice, Burton, had told him that defendant had fired the shots, was made after the *Miranda* warning. The only matter as to which the officer did not contradict himself was that the warning preceded the confession. That, of course, is what counts.

the true story of it."[4] Defendant then confessed to his participation in a robbery of the feed store during which, without any foreknowledge on defendant's part, Burton shot the two victims.[5]

No defense evidence on the admissibility of the confession or on the merits was offered.

On appeal, it is claimed that defendant did not intelligently waive his right to remain silent, that even if the waiver were adequate as to an adult, it was not adequate in view of defendant's minority, that the confession was involuntary and that the court erroneously denied a motion for a new trial. None of these points have merit.

## I.

Defendant's claim that—apart from his minority—he did not intelligently waive his constitutional rights boils down to two points: that he was still suffering from the aftereffects of the alcohol he had consumed the day before, and that Officer Armstrong was unable to testify in what way he "acknowledged" his recital of defendant's *Miranda* rights.

Armstrong testified that defendant did not seem intoxicated to him and that his mind appeared clear. Although defendant's speech was slurred, it was Armstrong's impression that that was the manner in which defendant "talks anyway . . . a style of speech." Actually, he could not say "it was slurred," but neither could he say that it was "exactly clear." Defendant's eyes did not appear to be "glazed."[6]

We cannot upset the trial court's implied finding that the previous day's consumption of alcohol did not affect the validity of the waiver.

With respect to the claim that the evidence of waiver is inadequate because Officer Armstrong could only testify that defendant "indicated" or "acknowledged" the various warnings, we are not quite certain whether the point made at the trial was that such evidence is substantively insufficient to support a finding of waiver or whether the admission of the testimony

---

[4]Armstrong also testified that his statement to the effect that defendant should not have to take the blame for something he did not do preceded defendant's statement: "No, it didn't go like that."

[5]After the first victim was shot by Burton, defendant did, however, leave the premises to ascertain whether anyone had heard the shot. He then returned and held the gun while Burton took the money from the cash register. He then returned the gun to Burton who shot the second victim.

[6]The arresting officer had testified that at the time of defendant's arrest "he had a sleepy glazed appearance, blank appearance on his face." At another point he called it "glassy."

violated the rule against lay opinion evidence. (Evid. Code, § 800.) We shall consider both arguments.

■ First, it should be clear that even if we had a tape recording of the conversation and could hear the defendant say loud and clear that he understood his rights, we could reach a finding that he did so only by inference.[7] All that happened here is that the trial court relied on a different inference: since the "acknowledgement" to which the officer testified may have been a mere nod of the head[8] it can hardly be interpreted as more than a statement that defendant heard, rather than that he understood the warnings. Thus we conclude that defendant understood because he said he heard, rather than that he understood because he said he understood. The jump may be longer, but the difference is not of constitutional magnitude.

■ The objection that the testimony should not have been admitted because it was in the form of an opinion or conclusion rests on a misconception concerning the proper function of the so-called opinion rule as it affects testimony of nonexperts. (Evid. Code, § 800.) ■ That rule merely requires that witnesses express themselves at the lowest possible level of abstraction. (McCormick, Evidence (1954) § 11.) Whenever feasible "concluding" should be left to the jury; however, when the details observed, even though recalled, are "too complex or too subtle" for concrete description by the witness, he may state his general impression. (*Manney* v. *Housing Authority*, 79 Cal.App.2d 453, 459 [180 P.2d 69].) ■ That is not what is involved here. Had Armstrong been able to recall whether defendant spoke or nodded, surely he could have testified which it was. The problem presented is a different one: the extent to which an indistinct recollection of matters personally observed by a witness is

---

[7] In *People* v. *Johnson*, 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865], the court said: "Once the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer *is sufficient evidence that he knows of his rights and chooses not to exercise them.*" (Italics added.) Defendant relies on *Frazier* v. *United States*, 419 F.2d 1161, where a waiver was held to be inadequate although the defendant had been given a complete *Miranda* warning and had signed an express waiver. However the reason for the holding was that the undisputed evidence showed that when the interrogating officer started to take notes at the beginning of the confession, Frazier said: "Don't write anything down. I will tell you about this but I don't want you to write anything down." This proved to the court that he was unaware of the fact that even an oral confession could be used against him.

[8] At one point during the *voir dire* examination of the officer he answered "Yes, sir" to the following question: "Q. He could have muttered it; he could have shook his head; he could have spoken, but as far as you are concerned there was an acknowledgement; is that correct?" In the context of the entire examination, during which the witness several times mentioned that defendant either "nodded" or spoke, this was an obvious case of being caught off guard by a compound question.

an impediment to his testimony. The matter is thoroughly discussed in sections 658, 728 and 1970 of Wigmore on Evidence (3d ed. 1940). Reference to the California cases cited there and to those collected by Witkin in section 1164 of his California Evidence (2d ed. 1966) adequately disposes of the objection.

## II.

■ Defendant claims that because of his youth he was incapable of making an intelligent waiver. He points to certain factors which distinguish him from the youths in *People* v. *Lara*, 67 Cal.2d 365, 383-389 [62 Cal. Rptr. 586, 432 P.2d 202], principally the absence of evidence of sophistication with respect to criminal matters. The record is indeed stingy as far as information concerning defendant's attributes is concerned. Just about all that we do know about him is that he was an 18-year-old boy who apparently was able to carry on an intelligent conversation. Such is the "totality of circumstances" (*Gallegos* v. *Colorado*, 370 U.S. 49, 55 [8 L.Ed.2d 325, 329, 82 S.Ct. 1209, 87 A.L.R.2d 614]; *People* v. *Lara*, *supra*, 67 Cal.2d at p. 383) with which we have to work. The trial court had somewhat more, since it was able to watch defendant's demeanor in the courtroom.

However, even on these sparse facts, the People made out a prima facie case of intelligent waiver. It is the law that if a minor defendant claims that for reasons peculiar to himself the fact was otherwise, it is up to him to produce the evidence. (*People* v. *Rodriguez*, 256 Cal.App.2d 663, 669-670 [64 Cal.Rptr. 253].)

## III.

■ Defendant's claim that he was coerced into the confession through trickery is presented in shotgun fashion. Nevertheless it is the most arguable of his contentions.

One matter should be cleared up at the outset: whether or not it matters that Bozzie Burton did or did not tell Armstrong that defendant had been the trigger-man, there is nothing in this record to suggest that Armstrong spoke falsely.[9] (Cf. *Frazier* v. *Cupp*, 394 U.S. 731, 739 [22 L.Ed. 2d 684, 693, 89 S.Ct. 1420]; *People* v. *Connelly*, 195 Cal. 584, 597 [234 P. 374]; see fn. 1, *ante*.) Further, there is no evidence in the record that

---

[9]Indeed, the officer's statement that he told defendant "exactly" what information he had, can be interpreted as meaning that he spoke the truth when he told defendant that Burton had accused him of being the actual killer. Although Armstrong testified that Burton had "involved" defendant in the crime, nobody ever asked him whether Burton had really said that defendant was the actual killer.

Armstrong held out any inducement except possibly the one to which we are about to refer.

What has, indeed, given us some pause is the officer's statement that defendant should not "take the blame" if he did not do the shooting. If this statement is to be construed as implying that the conduct to which defendant later confessed did not amount to first degree murder, it was, of course, false.[10]

We assume, at least for the sake of argument, that the deception, if any, was of such a nature as to be reasonably likely to procure an untrue statement.[11] (*People* v. *Ketchel,* 59 Cal.2d 503, 519-520 [30 Cal.Rptr. 538, 381 P.2d 394].) That seems justified, for if defendant had indeed personally killed one or both of the victims, he might try to lie himself into what he believed to be a lesser offense. We do not think, however, that realistically there was any deception.

First, the officer, as far as we know, knew nothing about defendant's involvement in the crime except what Burton had told him. For all he knew, Burton's statement might have been wholly true, wholly untrue— even as far as participation by defendant as a mere accomplice is concerned—or false only with respect to the identity of the actual killer. The officer's statement gains sinister significance only in the light of the contents of the confession that followed it.[12]

Second, we must assess any implication in the statement that an accessory has less to fear than a principal in the totality of the penal process. Officer Armstrong did not, after all, say that an aider and abettor to a felony murder is guilty of a lesser offense. A person convicted of a crime cares less about the words uttered by the judge at the time of sentence, than about the actual severity of the punishment. Unquestionably the

---

[10]Unquestionably the conduct to which Hurlic confessed was morally far less reprehensible than the cold blooded killing by Burton which he described in his confession. We do not believe, however, that in the context in which Armstrong and Hurlic conversed, moral blame was uppermost in their minds.

[11]In view of the conclusion which we have reached, we need not attempt to reconcile the rule that trickery and deception only invalidate a confession if they are reasonably likely to procure an untrue statement, with the general rule that a confession is involuntary unless it is "the product of a rational intellect and a free will" (*Blackburn* v. *Alabama,* 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274]) and inadmissible regardless of its truth. (*Rogers* v. *Richmond,* 365 U.S. 534, 540-545 [5 L.Ed.2d 760, 766-769, 81 S.Ct. 735]; *People* v. *Ditson,* 57 Cal.2d 415, 436-438 [20 Cal.Rptr. 165, 369 P.2d 714].) See the editorial comment in 99 A.L.R.2d 774, 778-779.

[12]We appreciate that the force of this point is somewhat weakened if defendant said "no, it didn't go like that" before the officer made his remark about not taking the blame. As noted earlier, at a later point in his testimony the officer reversed the sequence. Nevertheless, even under the earlier version, the officer was merely given notice that defendant was somehow involved—not necessarily criminally.

chances of an earlier measure of freedom on parole are infinitely better if the prisoner's record merely shows the degree of participation in the murder to which defendant confessed, rather than the acts he attributed to Burton. (Pen. Code, § § 1203.01, 3046.)

We do not believe the confession was involuntary.

Even though the case is not relied on by defendant, we should not close our discussion of this point without mentioning *People* v. *Johnson,* 70 Cal.2d 469 [74 Cal.Rptr. 889, 450 P.2d 265], which, in some respects, is too close to be ignored.

About 10 months after a felony murder in Los Angeles County, Johnson, a minor, was arrested in Connecticut and extradited from that state. After his return to California he made a confession similar to Hurlic's, as far as the degree of implication is concerned. It, too, was the only evidence linking the defendant to the crime. Although Johnson had, after a fashion, been advised of his rights at least a half dozen times, the Supreme Court reversed.[13] The reversal was amply justified by some of the uncontradicted facts: 1. Johnson never did waive his constitutional rights; 2. an investigator told him, at one point, that while anything he said could be used against him, the evidence would not be admissible in court, but was just an "investigative aid"; 3. the police knew that Johnson's family was actively trying to procure counsel; 4. they threatened Johnson in an effort to obtain a statement, as will be seen from the excerpt of the opinion quoted below; 5. Johnson was denied needed medical attention until he confessed; and 6. when, for undisclosed reasons, Johnson was taken to his mother-in-law's home, he was not told that he could talk to her.

Of course, in many ways *Johnson* distinguishes itself from this case. We need not belabor the differences. Further, the avowed rationale of *Johnson* was that the defendant never waived his constitutional rights knowingly and intelligently. We have held that the record in this case supports the finding of an adequate waiver. What troubles us is the emphasized passage in a portion of the opinion which we are about to quote in context, which passage, though used to support the holding that the waiver was inadequate, obviously derives its inspiration from the law relating to involuntary confessions: "Defendant testified that the officers told him his companions had accused him of shooting the victim, and that there was a first degree murder charge under investigation for which he could get the gas chamber. There was evidence that they exhorted him to tell the truth and indicated that all they were interested in 'is the truth.' However,

---

[13]Because of the time factor, the rights involved were those recognized in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], as explained in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

he stated they also told him no one would believe him because he denied everything, if they were the jury they would give him the gas chamber, if he had to go into the courtroom it would be best for him to go in the best light, and by denying it and not saying anything this would show malice and hatred, or just a senseless killing of a white man.

"This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct. It carries the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder (i.e. more lenient treatment by the court or jury). *To someone unskilled and uncounseled in the law it might have offered a hope that since no money was taken in the robbery and if, as he claimed he did not do the shooting, that he might be cleared of any serious charges. Because of the felony-murder rule his statements amounted to a confession of first degree murder* (see Pen. Code, §189). It stretches the imagination to believe that he knowingly and intelligently waived his right to be free from self-incrimination." (*People* v. *Johnson, supra,* 70 Cal.2d at pp. 478-479. Italics added.)

If the court meant to say, even by dictum, that whenever police urging to tell the truth leads an unsophisticated aider and abettor to believe that he cannot be prosecuted as a principal, any ensuing confession is inadmissible, defendant would have a point. We think, however, that even as a dictum in the field of involuntary confessions, *Johnson* is distinguishable.

First we note the fact that Johnson had more reason to expect leniency than Hurlic, because the robbery in which he had involved himself was unsuccessful. More important, however, is the specificity of the threats concerning the gas chamber and their falsity with respect to the consequences of silence. In addition Johnson was specifically told that he would appear in "the best light" if he talked. Compared to the investigators' exhortations in *Johnson*, Officer Armstrong's statement is pale stuff, indeed.

Far more closely analogous to this case is *People* v. *Hill*, 66 Cal.2d 536, 545-550 [58 Cal.Rptr. 340, 426 P.2d 908]. One of the codefendants in that case, Saunders, had been the driver of a car which took his codefendants Hill and Madorid from the scene of a robbery-murder. After the three were arrested Madorid confessed. Saunders was urged to "help himself," to consider his position as against that of his codefendants and to "grab a life-saver." He then signed a statement admitting that he had been the driver, but disclaiming knowledge that a robbery had been contemplated. Later, after Hill had also confessed, Saunders admitted prior knowledge of the robbery. Although Saunders claimed that the urgings

impliedly promised leniency, the confession was held to have been voluntary.[14]

In *People* v. *Ditson,* 57 Cal.2d 415, 432-433 [20 Cal.Rptr. 165, 369 P.2d 714] the court found nothing wrong with a confession by the co-defendant Cisneros, which the trial court had rejected, although the record revealed "searching questions and exhortations to help himself by revealing the acts of others [and] facts as to the dominant part of Ditson[15] or some other person in the criminal enterprise. . . ." Further Cisneros had been urged "to clear up the details of his own and Ditson's relative positions and activities. . . ."

We do not believe the emphasized passage in *Johnson* affects the result we have reached.

*Johnson* has also some bearing on the question of the validity of de-

---

[14]"The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, 'advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' (*People* v. *Nelson* (1964) 224 Cal.App. 2d 238, 250 [36 Cal.Rptr. 385], and citations appearing there.) In *Ditson,* for instance, the language of inducement, held not to render the ensuing confession involuntary, was as follows: ' "I'm not telling you I'm going to help you. I'm not promising you anything. I'm telling you, Carlos, help yourself. . . . Don't you see what I'm trying to do for you? . . . I want you to help yourself. I'm not promising you anything. . . ." ' (*People* v. *Ditson, supra,* 57 Cal.2d 415, 432, fn. 5 (petition for writ of cert. dism., 371 U.S. 937 [9 L.Ed.2d 273, 83 S.Ct. 311]); see also *People* v. *Nelson, supra,* 224 Cal.App.2d 238, 245, fn. 3.)

"When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. (See *People* v. *Thompson* (1890) 84 Cal. 598, 605-606 [24 P. 384]; *People* v. *Barric* (1874) 49 Cal. 342, 344-345; *People* v. *Leavitt* (1929) 100 Cal.App. 93, 95 [279 P. 1056]; cf. *People* v. *Nelson, supra,* 224 Cal.App.2d 238, 251.)

"In the instant case the record fails to disclose that any improper inducements were held out to Saunders. The officers only pointed out those benefits which would naturally accrue to him if his true role in the crime was made known, but such benefits did not include leniency or favorable treatment by the state. The officers made no express or implied promises of leniency or other advantage obtainable from the authorities because of, or in return for, a statement. We conclude that neither of Saunders' statements was involuntary because of any improper inducements made to him by the police." (*People* v. *Hill, supra,* 66 Cal.2d 536 at pp. 549-550.)

[15]Ditson had been the mastermind of the murder involved.

fendant's waiver of his right to remain silent, discussed in part II of this opinion. In the last part of the *Johnson* opinion the court points out that the People made no showing that Johnson "had a criminal history or any sophistication in courtroom or police procedures." (*People* v. *Johnson, supra,* 70 Cal.2d 469 at p. 479.) These remarks, however, were made to rebut a claim that Johnson was aware of his constitutional rights in spite of the tainted warnings he received from the police. In our case, of course, the warnings were letter perfect.

### IV.

At the time of his motion for a new trial, defendant presented a declaration by his aunt to the effect that at 8:30 in the morning of February 14 she had appeared at the police station where defendant was jailed, but was told that she could not talk to defendant because he was being questioned. No reason was given why this evidence was not available at the trial which took place more than seven months after defendant's arrest. There was no error in denying the motion.

The judgment is affirmed. The trial court is, however, directed to correct its minute order of November 12, 1969, to reflect the dismissal of count II.

Stephens, J., and Aiso, J., concurred.