Filed 10/19/20  P. v. Baxter CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C087736 |
| Plaintiff and Respondent, | (Super. Ct. No. 16F336) |
| v. | |
| ANTHONY HARRISON BAXTER, | |
| Defendant and Appellant. | |

Defendant Anthony Harrison Baxter murdered Michael Helsby and Georgia Engelhaupt because, as defendant explained to police following his arrest, they "disrespected" his wife and her daughter.  The means he employed was strangulation and stabbing each victim in the chest with a butter knife.  At trial, defendant acknowledged killing Helsby and Engelhaupt, but claimed he initially intended only to assault Helsby and "ended up flipping" and "taking lives that [he] did not want to take."  However, defendant also admitted he stabbed both victims with the butter knife because strangling

1

them "was taking so long" and he felt he "had to just hurry up and finish the situation." Defendant then left the scene in Engelhaupt's car.

Defendant was convicted by jury of two counts of first degree murder and one count of unauthorized taking or driving a vehicle. The jury also found a multiple-murder special-circumstance allegation attached to both murder counts to be true. Following a court trial on the question of whether defendant was legally insane at the time he committed the murders, the trial court found defendant had not carried his burden of proving the defense. Defendant was sentenced to state prison to serve two consecutive terms of life without the possibility of parole plus a consecutive determinate term of three years.

On appeal, defendant contends: (1) his trial counsel provided constitutionally deficient assistance by failing to present, during the guilt phase of the trial, expert psychological testimony relevant to whether or not defendant killed Helsby and Engelhaupt both with malice aforethought and with premeditation and deliberation; (2) the trial court prejudicially abused its discretion and violated defendant's federal constitutional rights by excluding lay opinion testimony from defendant concerning his mental disability; (3) the trial court prejudicially abused its discretion and also violated defendant's constitutional rights by allowing the prosecution to impeach his testimony with prior convictions; (4) the prosecutor engaged in prejudicial prosecutorial misconduct by informing the jury defendant agreed to take a polygraph examination; and (5) relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant claims the trial court violated his constitutional right to due process by imposing various fines, fees, and assessments without first determining his ability to pay.

We affirm. Defendant cannot prevail on his claim of ineffective assistance of counsel because there is no reasonable probability of a more favorable outcome had defense counsel obtained admission of the psychological evidence defendant now wishes had been admitted during the guilt phase of the trial. The evidence supporting the jury's

2

conclusion defendant murdered Helsby and Engelhaupt both with malice aforethought and with premeditation and deliberation was very strong. Defendant essentially admitted as much. Twice. Compared to this strong evidence defendant committed two first degree murders, the psychological evidence admitted during the sanity phase of the trial did not, as a matter of law, support a finding of provocation sufficient to reduce these murders to voluntary manslaughter, and only marginally supported a reduction to second degree murder. We also reject defendant's assertions of evidentiary error. Defendant's claim of prosecutorial misconduct is forfeited; nor did defense counsel provide constitutionally deficient assistance by failing to preserve the claim. Finally, we also reject defendant's *Dueñas* claim.

FACTS

In January 2016, defendant's wife, M., was living in a duplex in Anderson with her sister, daughter, nephew, and Helsby, who moved into the unit prior to M.'s family. Helsby initially allowed M.'s sister and nephew to move into one of the unit's bedrooms. About a week before the murders, he also allowed M. and her six-year-old daughter to move into a second bedroom. M. and her sister were friends with the tenant of the duplex's other unit, C., who introduced them to Helsby before he let them move in. Helsby's girlfriend, Engelhaupt, did not live there, but periodically came over and spent the night. She did not like that Helsby allowed so many people to move in with him.

Defendant came over to visit M. a few times during the time she lived with Helsby. Defendant's relationship with M. was "rocky" and they "argu[ed] constantly." One such argument occurred the night of the murders. When defendant came over to visit M. that evening, Helsby was cooking soup in the kitchen. C. and his girlfriend, N., were also at the residence. At some point, Helsby pulled a pair of women's underwear out of his pocket and smelled them in front of defendant. The underwear belonged to M., who had done her laundry that day. Helsby's conduct angered defendant. As M. described in her testimony, defendant's face "went . . . bright red" and he clenched both

3

fists. The record does not reveal whether any words were exchanged between defendant and Helsby at that point, but N. testified she heard defendant and M. arguing loudly outside and described defendant's part of the exchange: "He's talking about he's going to kill everybody." Defendant denied making any threats, but acknowledged in his testimony that his anger at Helsby's conduct was intensified by the methamphetamine he ingested a few hours earlier.

After this incident, C. and N. gave M. and her daughter a ride to a friend's house. Defendant joined them for a portion of the ride, but got out at a convenience store after he and M. continued to argue in the car. At some point during the next two or three hours, defendant returned to the duplex and murdered both Helsby and Engelhaupt, who apparently had come over in the meantime.

Defendant is the only living person who knows the details of these particular murders. We therefore rely on the statement he gave to police following his arrest and his trial testimony in providing the following summary, noting he was quite forthcoming in both. Defendant told the interrogating officers that he "was fed up with [M.] bein' disrespected," so he returned to the duplex. When he walked inside without knocking, he found Helsby and Engelhaupt asleep on opposite sides of the couch in the living room. Defendant reached over the back of the couch and grabbed Helsby by the throat, initially "plannin' on just chokin' him out." Helsby woke up, "but he couldn't do nothing." After a few minutes of choking Helsby, Engelhaupt woke up and grabbed her cell phone. Defendant "couldn't have her doin' that," so he let go of Helsby, came up behind Engelhaupt, and used his arm to choke her "until her body went limp." Helsby was lying on the couch "gasp[ing] for air" while defendant choked Engelhaupt, but eventually started to get up, so defendant grabbed a wine bottle that was nearby and "hit him over the head, um, twice." The second blow caused the wine bottle to shatter and sent Helsby's blood onto defendant's shirt. Defendant then picked up a butter knife from the

4

nearby kitchen counter and stabbed Helsby twice in the chest before walking over to Engelhaupt and also stabbing her in the chest with the knife.

Defendant claimed he "just snapped," but also explained that when Engelhaupt "got up, went to try to use her phone," that was when he realized he "had to take them both out." Defendant also told the officers he stabbed the victims because choking them was taking too long and he "had to make sure" they were dead. When asked to be more specific about the disrespect he felt the victims had shown M., defendant responded that Engelhaupt "disrespected" M. by telling Helsby to kick her and her daughter out of the duplex and "into the cold," adding: "And that - that's bullshit. That's a little girl." With respect to Helsby, defendant claimed "he has, uh, broken into their bedrooms, uh, took all their stuff, throwed them, um, outside into the mud. Um, he's, uh, blocked them out of the apartment, you know? He - he's basically, um - he's tried to put them out, you know?"

During defendant's testimony at trial, he repeated the claim that Helsby threw M.'s family's belongings "out in the rain" and that Engelhaupt told Helsby to do so. However, he also described two additional incidents involving Helsby, neither of which he told the interrogating officers. First, he claimed M. told him that Helsby had come into her room at night and M. "woke up with him standing over the top of [her and her daughter] and watching them while they were sleeping." The second incident involved Helsby smelling M.'s underwear, described above.[1]

---

[1]  M. largely corroborated defendant's account of the underwear incident, although defendant testified he believed Helsby smelled two pairs of underwear, one he believed belonged to M. and the other he believed belonged to her daughter, whereas M. testified she saw Helsby holding one pair of her underwear and did not see him smelling them. With respect to the other incident, M. testified she told defendant that Helsby had tried to get into her bedroom, but she did not remember telling him Helsby was in the room standing over her and her daughter when she woke up.

5

Defendant testified that he was named after Saint Anthony and "was raised to be a family protector." Although M.'s daughter, K., was not his biological daughter, she was three years old when defendant came into her life and he considered her to be his daughter, adding: "Before her father passed away, I made a vow to him . . . that I would watch out after [K.] as my own biological daughter." Defendant testified to various "learning disabilities" he had while he was in school and continuing "all the way up until now." He also testified to having suffered physical and sexual abuse as a child and claimed Helsby's conduct brought back memories of the latter abuse. Defendant claimed he ingested methamphetamine about four hours before killing Helsby and Engelhaupt and stated he "was still under the influence" when he did so. After he saw Helsby smell M.'s underwear that night, he was "very angered" and this anger was intensified by the methamphetamine.

Turning to the murders, defendant testified he went to the duplex that night not to kill anyone, but only to "physically check [Helsby], slap him around a few times," for disrespecting M. and her daughter. When asked whether something happened to cause defendant to "elevate the attack," defendant answered: "Yes. As -- when I first got there, you know, I saw them asleep. I was just going to choke Helsby out. However, it was taking a long time. And by that, he ended up flailing his arms and just moving them sporadically. [¶] And by him doing so, he had his -- [Engelhaupt's] feet and had woken her up. So by him waking her up, I had to act as if he was choking so no -- no cops would be called. And then -- then she went to call the off -- officers, I had asked her to get me [Helsby's] heart medicine, okay? And when he -- and when she went to grab the medicine and she got close enough to give some to [Helsby], that's when I -- I had to strange -- not strangle her, 'cuz I honestly wasn't trying to kill her, but I -- I did end up choking her out. [¶] And then I knew that she already saw my face, so it has gone too far. And so as I had [Engelhaupt], I -- the -- where I was standing was against the back of the couch. And the couch is a corner couch that was pushed up against the kitchen

6

counter. And on the corner of the counter was a butter knife. It wasn't plan -- planted there by me or nothing like that. The apartment was kind of dirty. And it was just there. [¶] So as -- as -- as I was strangling [Engelhaupt], I saw Helsby stirring. And I couldn't have him getting up and getting to the phone, so I grabbed the bottle that was right there on the counter as well, which was an old wine bottle-type, one of the thick bottles, and I had hit him rapidly twice over the head, which it had shattered on the second time and he fell. [¶] The -- then I -- this was taking so long. There was already bloodshed, so I had to just hurry up and finish the situation. And that's when I picked up the butter knife, [Engelhaupt] was already passed out. So I plunged the butter knife into [Helsby's] chest . . . . And then I did -- I -- I had to repeat the same action, regrettably, on [Engelhaupt]."

After committing the murders, defendant took Engelhaupt's car and went to pick up M. and her daughter from where C. had dropped them off earlier in the night. M. described defendant's demeanor as "kind of down, but kind of hyper." Defendant told her, "Let's go, we got to go now." M. said she wanted to go to her father's house and asked whose car he was driving. Defendant said it was "his homegirl's car" and told M.: "Well when we get to your dad's house, don't warn anybody, but we're going to go on a road trip." Defendant also told M. "he took care of what he had to do over at Mike's."

They arrived at M.'s father's house early the next morning. Her father also asked defendant where he got the car. Defendant again said the car belonged to his "homegirl." Defendant then poured himself some coffee and went outside, saying, "he was going to clean the car out," returning a short time later to burn some papers in the fireplace. Later that morning, defendant told M.'s father the car was actually "hot." M.'s father asked defendant to remove the car from his property. Defendant did so, and returned on foot one or two hours later. A short time after that, defendant asked M.'s father for a ride and was dropped off at the fairgrounds.

The bodies of Helsby and Engelhaupt were found later in the afternoon. We need not recount the details of their discovery here, or set forth the remainder of the evidence

connecting defendant to the murders. It will suffice to state defendant's account of strangling and stabbing Helsby and Engelhaupt was confirmed by the physical evidence and testimony from the forensic pathologist who examined the victims' bodies. We do note the murder weapon was never found; defendant admitted "he put it down a storm drain." Defendant also admitted he took the victims' cell phones, said he threw them into a field, and helped an investigating officer draw a map of where he did so. One of the cell phones was found at the designated location; the other was found in a box at the location where defendant was arrested.

Based on the foregoing set of facts, defendant was convicted by jury of two counts of first degree murder, one count of unauthorized taking or driving a vehicle, and the jury also found a multiple-murder special-circumstance allegation attached to both murder counts to be true. Evidence adduced during the subsequent court trial on the question of whether defendant was legally insane at the time he committed the murders will be set forth in some detail during the discussion portion of the opinion, to which we now turn.

DISCUSSION

I

*Ineffective Assistance of Counsel*

Defendant contends his trial counsel provided constitutionally deficient assistance by failing to present, during the guilt phase of the trial, expert psychological testimony relevant to whether or not defendant killed Helsby and Engelhaupt both with malice aforethought and with premeditation and deliberation. We are not persuaded.

**A.**

*Psychological Testimony Adduced During the Sanity Phase*

After defendant testified to being, as he put it, "not correctly sane in my mind," when he committed the murders, and further stating, among other things, that he believed "people were chasing" and "out to kill" him, and that he sought mental healthcare during the week before the murders and was prescribed an antidepressant medication, the

8

prosecution adduced testimony from two clinical psychologists, Dr. Kent Caruso and Dr. Mark Saunders.

Dr. Caruso testified he was appointed by the court to evaluate defendant. During a three-hour interview conducted at the jail, Dr. Caruso noted defendant's thinking "was at times overly simplistic and a bit concrete," but "otherwise adequately clear, lucid, linear." Defendant's communication ability indicated "he was not a highly efficient processor of information." These observations were consistent with defendant's score on an IQ test administered by the doctor: "The result indicated that probably, at best, low average, innate verbal intelligence, with some verbal skills at elementary school levels, some educational levels, at third, fourth grade. Some verbal intellectual problem solving, bordering on mild mental retardation." The doctor also noted defendant's educational and work history indicated "there may have been some developmental problems or other problems related to brain injury due to early onset substance abuse."

Dr. Caruso also testified defendant exhibited paranoid and persecutory thinking, explaining: "[H]e was a very suspicious individual. He had persecutory thoughts, tended to see things, events, various circumstances outside himself as being to blame for his problems." The doctor explained the "overall picture" of defendant's mental health was a "very complex picture because of his childhood background of abuse and neglect, severe abuse and neglect," including "significant depravations," and "[t]he possibility of brain injury due to ingestion of drugs from marijuana at an early age to methamphetamine, LSD." Dr. Caruso added this likely brain damage would have "negatively impacted, his mind, his ability to problem solve, whether it was back in school during his teens or currently, even though, he was eventually able to get his GED at the jail."

Dr. Caruso diagnosed defendant as having antisocial personality disorder with chronic depression, for which he was prescribed an antidepressant, as well as posttraumatic stress disorder, all of which were "exacerbated by the chronic substance

9

abuse, and, primarily, the methamphetamine." However, nothing in Dr. Caruso's findings indicated defendant was unable to appreciate the wrongfulness of his conduct.

Dr. Saunders testified he interviewed defendant in six sessions, administered various psychological examinations, also interviewed other individuals who knew defendant, and reviewed various documents, such as police reports and mental health records. Defendant "indicated that he had a long mental health history that dated back from the time he was a child. He indicated a history of severe emotional, physical, and sexual abuse." Defendant also told the doctor he began drinking alcohol as a child and progressed to LSD, PCP, and methamphetamine during his teenage years. Defendant's prison records indicated he was diagnosed with an unspecified mood disorder, polysubstance abuse, and posttraumatic stress disorder. Unlike Dr. Caruso, Dr. Saunders found defendant's intellectual ability to be within "a normal range of intellectual functioning."

Dr. Saunders diagnosed defendant with substance abuse disorder, stimulant-induced psychotic disorder, and posttraumatic stress disorder. The doctor opined defendant's crimes were "consistent with a lifetime of reacting, sometimes violently, to perceptions of -- about being disrespected or his family being disrespected," but were "not consistent [with] being in some way guided by psychotic beliefs or behaviors."

**B.**

*Analysis*

Defendant argues the foregoing psychological testimony, although it "did not support an insanity defense, would have supported the subjective element of a defense of provocation and heat of passion," and "[t]he guilt phase jury should have known that [defendant] was subject to compounding mental disorders, in order to determine the presence of the necessary mental states for first degree murder." Defendant also notes the trial court specifically ruled "both sides may offer evidence of mental illness upon a proper foundation as to the issue of whether or not the Defendant actually formed a

10

required specific intent, premeditated, deliberated, or harbored malice aforethought," and argues his trial counsel was constitutionally ineffective for failing to adduce this evidence during the guilt phase of the trial.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid*.) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

We need not determine whether defense counsel's failure to present psychological testimony on the issues of provocation and heat of passion fell below an objective standard of reasonableness because there is no reasonable probability of a more favorable outcome had counsel obtained admission of the evidence. In assessing prejudice under the reasonable probability standard, "the court 'may consider . . . whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak,' that there is no reasonable probability the

11

jury would have decided differently . . . ." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1495 [applying the standard for prejudice in *People v. Watson* (1956) 46 Cal.2d 818]; see also *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [The standard for prejudice applied in reviewing error under *Watson* is essentially the same standard for prejudice applied to the test for ineffective assistance of counsel].)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).)[2] Such malice "may be express or implied." (§ 188.) Express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a "willful, deliberate, and premeditated killing." (§ 189, subd. (a).) "All other kinds of murders are of the second degree." (*Id.*, subd. (b).)

"Manslaughter is a lesser included offense of murder. . . . Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or

---

[2]     Undesignated statutory references are to the Penal Code.

a conscious disregard for human life, [i.e., express or implied malice,] a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted.)

Moreover, "if the provocation is insufficient to reduce a murder to manslaughter, it may nevertheless reduce the murder from first to second degree." (*People v. Wright*, *supra*, 242 Cal.App.4th at p. 1494.) "Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of both premeditation and malice (thereby reducing the offense to manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree; i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation." (*People v. Thomas* (1945) 25 Cal.2d 880, 903.)

The evidence supporting the jury's conclusion defendant murdered Helsby and Engelhaupt both with malice aforethought and with premeditation and deliberation was very strong. In arguing the strength of such evidence, the Attorney General relies on *People v. Anderson* (1968) 70 Cal.2d 15, in which our Supreme Court noted three types of evidence typically provide support to a murder conviction based on premeditation and deliberation, i.e., planning activity, motive, and manner of killing. "[T]o sustain a verdict of premeditated and deliberate murder, [*Anderson*] required (1) extremely strong evidence of planning, (2) evidence of motive in conjunction with evidence of planning or of a calculated manner of killing, or (3) evidence of all three indicia of premeditation and deliberation." (*People v. Memro* (1995) 11 Cal.4th 786, 863; see *Anderson*, at pp. 26-27.) However, in *People v. Perez* (1992) 2 Cal.4th 1117, our Supreme Court cautioned that "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation." (*Id.* at p. 1125.) Since *Perez,* the court has cautioned on multiple occasions " '[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson*

analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.' [Citation.] In other words, the *Anderson* guidelines are descriptive, not normative. 'The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive.' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; see also *People v. Hovarter* (2008) 44 Cal.4th 983, 1019.)

Here, defendant's statement to police and trial testimony, corroborated by the physical evidence and testimony from other witnesses, established both motive and a calculated manner of killing. Defendant admitted to the interrogating officers, and to the jury at trial, that he killed Helsby and Engelhaupt because they disrespected M. and her daughter. Helsby disrespected M. by smelling her underwear a few hours before defendant killed him. Defendant also believed Helsby had entered M. and her daughter's bedroom at night on at least one occasion and stood over them watching them sleep. Defendant further believed Helsby and Engelhaupt disrespected M. and her daughter by seeking to kick them out of Helsby's residence. While defendant claimed he went over to the duplex only to "physically check [Helsby], slap him around a few times," the jury could reasonably have concluded defendant possessed a strong motive to kill both Helsby and Engelhaupt.

Defendant also admitted to killing the victims in a calculated manner. He began by strangling Helsby, switched to strangling Engelhaupt when she woke up and tried to call for help, hit Helsby over the head with a wine bottle when he began to recover from the aborted strangulation, and then stabbed both victims in the chest with a butter knife. Defendant resorted to stabbing the victims because, as he candidly admitted, "this was taking so long" and he "had to just hurry up and finish the situation." He stabbed Helsby twice, and believed he stabbed Engelhaupt twice (although she was actually stabbed only

14

once), because he "had to make sure" they were dead. Thus, in addition to the calculated manner of killing, defendant admitted engaging in the required calculation. Even if the jury believed he initially intended to "check" Helsby, that intent changed during the extended period of time the murders took to complete. By the time defendant stabbed both Helsby and Engelhaupt with the butter knife, he made a cold and calculated decision to kill.

Compared to the strong evidence defendant committed two first degree murders, the psychological evidence admitted during the sanity phase of the trial did not support a finding of provocation sufficient to reduce these murders to voluntary manslaughter, and only marginally supported a reduction to second degree murder.

Beginning with heat of passion voluntary manslaughter, even if we assume such evidence tended in reason to make it more likely defendant "actually, subjectively, kill[ed the victims] under the heat of passion," as our Supreme Court explained in *People v. Steele* (2002) 27 Cal.4th 1230, " 'this heat of passion must be such a passion as would naturally be aroused in the mind of *an ordinarily reasonable person* under the given facts and circumstances,' because 'no defendant may set up his [or her] own standard of conduct and justify or excuse himself [or herself] because in fact his [or her] passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of *the ordinarily reasonable* [*person*].' [Citation.]" (*Id.* at pp. 1252-1253, italics added.) In that case, the court went on to explain that although evidence of the defendant's intoxication coupled with "various mental deficiencies" and "psychological dysfunction due to traumatic experiences . . . may have satisfied the subjective element of heat of passion," such evidence "does not satisfy the objective, reasonable person requirement, which requires provocation by the victim. [Citation.] 'To satisfy the objective or "reasonable person" element of this form of voluntary manslaughter, the accused's heat of passion must be due to "sufficient provocation." '

15

[Citation.] '[E]vidence of defendant's extraordinary character and environmental deficiencies was manifestly irrelevant to the inquiry.' [Citation.]" (*Id*. at p. 1253.)

Here, there was no evidence Engelhaupt provoked defendant at all, let alone to an extent sufficient to cause a reasonable person to act rashly and without reflection. Helsby, on the other hand, did provoke defendant by smelling M.'s underwear in front of him in the kitchen the night of the murder. However, that happened two or three hours before defendant returned to the residence and killed him. Even assuming this conduct would have supported mitigation to voluntary manslaughter had defendant killed Helsby immediately in response to the provocation, we conclude no reasonable person would have remained sufficiently inflamed after such an extended period of time to mitigate Helsby's murder to voluntary manslaughter. Thus, even had the jury been informed of defendant's mental disability and other psychological diagnoses, there was no basis to convict defendant of voluntary manslaughter under a heat of passion theory.

Turning to second degree murder, "a subjective test applies to provocation as a basis to reduce malice murder from the first to the second degree: it inquires whether the defendant in fact committed the act because he [or she] was provoked. The rationale is that provocation may negate the elements of premeditation, deliberateness and willfulness that are required for that degree of the crime." (*People v. Jones* (2014) 223 Cal.App.4th 995, 1000.) Again, we conclude no reasonable jury would have concluded Engelhaupt provoked defendant at all. Moreover, even if the jury were to have concluded, based on the psychological testimony defendant wishes had been admitted in the guilt phase of the trial, that defendant began his assault on Helsby due to Helsby's earlier provocation, defendant's own testimony and prior statement to police candidly admitted he stabbed both Helsby and Engelhaupt, not because of the provocation, but because strangling them was taking too long. In addition, the evidence also establishes that defendant killed Engelhaupt to eliminate a witness to his assault on Helsby.

16

We conclude there is no reasonable probability of a different outcome had the jury heard the psychological testimony admitted during the sanity phase of the trial.

## II

### *Exclusion of Lay Opinion Testimony*

Defendant also claims the trial court prejudicially abused its discretion and violated his federal constitutional rights by excluding lay opinion testimony from defendant concerning his mental disability. We disagree.

### A.

### *Additional Background*

The prosecution moved in limine to preclude defendant from testifying to having a mental disability or other mental health diagnosis, arguing such testimony would amount to inadmissible hearsay, lack foundation, and "is not relevant unless and until an expert could then relate how that is probative of any issue in this case." Prior to defendant's testimony, after the trial court informed counsel that "both sides may offer evidence of mental illness upon a proper foundation as to the issue of whether or not the Defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought," the prosecution asked whether this ruling would allow defendant to "get up there and tell the jury he's mentally retarded." The trial court responded: "That's assuming a proper foundation and basis for that opinion. And I'm not sure the comment that you just made or the example you just gave me would satisfy that requirement. But I'm saying, certainly, it is proper to offer evidence that goes to whether or not the Defendant actually formed specific intent, premeditation, deliberation, and so forth."

The prosecutor then objected to the proffer, arguing defendant would either be "relying on something an expert would have told him in the past, which is hearsay," or providing a diagnosis of himself without the requisite qualifications to offer such an expert opinion. The trial court agreed defendant could not offer a diagnosis, but indicated "an individual may testify as to particular symptoms or behaviors that that individual

17

personally perceived." The prosecutor then clarified his position that while defendant could testify that he struggled in school, he should not be allowed to testify to having a diagnosed mental disability. The trial court agreed, stating, "that is the line I'm drawing." Defense counsel then argued defendant should be allowed to testify: ". . . I am mentally disabled. I have a speech impediment. I have learning disabilities. I don't process things the way other people process things." Counsel argued such testimony would not be expert testimony of a specific diagnosis, but instead "would be sort of a lay opinion." The trial court indicated its belief that some of the examples given by defense counsel crossed the line into expert testimony, but reserved ruling until it was able to "take them on a question-by-question basis."

During defendant's testimony, defense counsel asked whether he had a speech impediment. When defendant answered that he did, counsel asked whether he knew the reason why. Defendant answered: "Yes. I was -- am I allowed to say it? I was born mentally retarded and --" At this point in defendant's answer, the prosecutor objected on grounds of relevance and foundation. The trial court sustained the objection on the latter ground. Defense counsel then asked whether defendant had a speech impediment as long as he could remember. Defendant answered: "Yes, sir. I went through therapy all through my childhood ages -- all the way up until now. I'm still going through therapy. I have trouble comprehending. I have trouble --" Defense counsel then interrupted to ask whether defendant had "learning difficulties in school" and "what were those?" Defendant answered that he did and explained: "Due to the fact that I was slow and I had these learning disabilities, I was placed in what we call -- or the school system calls SED, which stands for seriously emotionally disturbed. And I went through these classes all through to my senior year." When counsel asked what "being slow" meant to defendant, he answered: "Being slow -- well, for a prime example, which would be just second nature to you -- like, for example, knowing your times tables. I, myself, I do not know

18

my times tables, and still have to use paper and all that stuff so I can be able to add or subtract times tables."

## B.

### *Analysis*

Evidence Code section 800 provides:  "If a witness is not testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is:  [¶]  (a) Rationally based on the perception of the witness; and  [¶]  (b) Helpful to a clear understanding of his [or her] testimony."  This provision "merely requires that [lay] witnesses express themselves at the lowest possible level of abstraction.  [Citation.]  Whenever feasible 'concluding' should be left to the jury; however, when the details observed . . . are 'too complex or too subtle' for concrete description by the witness, he [or she] may state his [or her] general impression."  (*People v. Hurlic* (1971) 14 Cal.App.3d 122, 127; see also *People v. Melton* (1988) 44 Cal.3d 713, 744 [lay witness permitted to express an opinion based on his or her perception "where the concrete observations on which the opinion is based cannot otherwise be conveyed"].)

In arguing the trial court abused its discretion by excluding defendant's opinion that he was "born mentally retarded," defendant relies primarily on *People v. McAlpin* (1991) 53 Cal.3d 1289, a child sexual abuse case in which our Supreme Court held two of the defendant's character witnesses could offer lay opinion testimony, based on their personal observations of the defendant's conduct with their daughters, that the defendant was "not a person given to lewd conduct with children."  (*Id*. at p. 1309.)  Similar opinion testimony from a third character witness, however, was properly excluded because it "was not based on personal observation of defendant's 'conduct with children.' "  (*Id*. at pp. 1308-1309.)

Here, defendant certainly possessed personal knowledge of his own intellectual functioning.  However, the trial court did not sustain an objection to defendant's opinion

he was mentally impaired based on improper lay opinion. Instead, the trial court sustained an objection to defendant's statement he was "born mentally retarded" on "foundation" grounds. It is not clear how defendant knew he was born with a cognitive impairment, as opposed to having developed a learning disability due to other factors, such as trauma caused by physical abuse or drug and alcohol use as a child. Nor is it at all apparent how one would come to have personal knowledge of being born with a cognitive impairment. For these reasons, we cannot conclude the trial court abused its discretion in sustaining the prosecution's objection on foundation grounds. Inquiry was not shut down. The trial court merely required defense counsel to lay a foundation for defendant's personal knowledge of his cognitive impairment. Thereafter, counsel elicited defendant's opinion that he suffered from learning disabilities and the basis for such an opinion. The trial court did not abuse its discretion in so ruling. Nor was defendant "denied his right to present a defense."

## III

### *Admission of Impeachment Evidence*

Defendant further asserts the trial court prejudicially abused its discretion and also violated his constitutional rights by allowing the prosecution to impeach his testimony with prior convictions. Not so.

" 'Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352.' [Citation.]" (*People v. Bedolla* (2018) 28 Cal.App.5th 535, 550.) "In exercising its discretion, the trial court must consider," but "need not . . . rigidly follow[]," the following four factors: "(1) Whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of

20

the impeachment by prior convictions." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.)

Here, the trial court allowed the prosecution to impeach defendant's testimony with a 1999 conviction for unlawful taking or driving a vehicle, a 2000 conviction for possession of marijuana for sale, and 2012 and 2013 convictions for domestic violence offenses. The trial court concluded each of these convictions involved moral turpitude and was therefore "relevant to show a lack of credibility." Turning to the Evidence Code section 352 analysis, the trial court explained: "With regard to the timing of the offenses, certainly the convictions in 1999 and 2000 are remote being almost 20 years ago. But, on the other hand, there is also a record of criminal behavior and incarceration on an almost continuous basis between that time and now. [¶] The Court considered that nearness in time to the prior -- of the priors to the present offense. I also considered the fact that the two corporal injury priors are for the same or similar conduct. And in this case, obviously, we do have a [Vehicle Code section] 10851 charge as well. So the 1999 prior is also related to the same or similar types of conduct. [¶] However, I believe, given the issues in this case, I don't believe the prejudicial value of the fact that the priors are of a somewhat similar nature would overcome the probative value of those prior convictions."

Applying the four factors, there was no abuse of discretion. First, each of the convictions with which defendant was impeached involved moral turpitude and therefore reflected adversely on defendant's honesty. (See, e.g., *People v. Zataray* (1985) 173 Cal.App.3d 390, 399 ["auto theft prior conviction clearly involves moral turpitude"]; *People v. Standard* (1986) 181 Cal.App.3d 431, 435 ["possession of marijuana for sale involves moral turpitude"]; *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402 [domestic violence, i.e., entering "a special relationship for which society rationally demands, and the victim may reasonably expect, stability and safety, . . . and then to violate it wilfully and with intent to injure, necessarily connotes the general readiness to do evil that has been held to define moral turpitude"].)

21

Second, with respect to remoteness, as the trial court acknowledged, the 1999 and 2000 convictions were indeed remote, but they were "nonetheless admissible because [defendant] did not subsequently lead a blameless life" and " 'the systematic occurrence of [defendant's] priors over a 20-year period create[d] a pattern that [was] relevant to [his] credibility.' [Citation.]" (*People v. Green* (1995) 34 Cal.App.4th 165, 183.)

Third, the trial court did not abuse its discretion by concluding the similarity of the prior conduct did not preclude impeachment with prior convictions. "Prior convictions for the identical offense are not automatically excluded. 'The identity or similarity of current and impeaching offenses is just one factor to be considered by the trial court in exercising its discretion.' [Citation.]" (*People v. Green*, *supra*, 34 Cal.App.4th at p. 183.) The trial court concluded defendant would not be unduly prejudiced by impeachment with one remote prior conviction that was identical to defendant's present charge of unlawful taking or driving a vehicle, or with two more recent domestic violence convictions that were only marginally similar to the murder charges in the sense that both involved violent conduct.

Fourth, the trial court's decision to admit the priors for impeachment purposes had no adverse impact on defendant's right to testify "because defendant actually took the stand and suffered impeachment with the priors." (*People v. Mendoza*, *supra*, 78 Cal.App.4th at p. 926.)

The trial court neither abused its discretion nor violated defendant's constitutional rights by allowing the challenged impeachment.

## IV

### *Prosecutorial Misconduct*

Defendant also contends the prosecutor engaged in prejudicial prosecutorial misconduct by informing the jury that defendant agreed to take a polygraph examination. The claim is forfeited by defendant's failure to object to the claimed misconduct below. (*People v. Dykes* (2009) 46 Cal.4th 731, 757 ["failure to object in a timely manner to

22

asserted prosecutorial misconduct . . . results in the forfeiture of the claim on appeal"].) Anticipating this conclusion, defendant argues his trial counsel was constitutionally ineffective for failing to so object. This alternative claim fails because defendant has not persuaded this court he was prejudiced by counsel's failure to object.

During the prosecution's opening statement to the jury, after describing the beginning of defendant's police interrogation (during which defendant initially denied involvement in the murders), the prosecutor went on to describe the circumstances in which defendant ultimately admitted killing both Helsby and Engelhaupt. These circumstances involved defendant agreeing to take a polygraph examination. As the prosecutor informed the jury, defendant was given an opportunity to take a polygraph examination and agreed to do so. However, before that examination was administered, during a "pre-polygraph interview" with the examiner, defendant "all of a sudden, looks down and says -- I'm quoting -- I'm going to cut the bullshit. I did it. And then starts to explain to the polygraph examiner what it was that he did."

Evidence Code section 351.1 provides in relevant part: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or *any reference to an offer to take*, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results." (Evid. Code, § 351.1, subd. (a), italics added.) Thus, evidence of defendant's offer to take a polygraph examination was inadmissible. However, " 'remarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.' " ' [Citation.]" (*People v. Dykes*, *supra*, 46 Cal.4th at p. 762.) Assuming this standard is met, and further assuming defense counsel's failure to object to the improper comment fell below an objective standard of reasonableness, defendant has not demonstrated a reasonable probability of a more favorable outcome had defense counsel

23

objected to the prosecutor's improper statement. As we have already set forth in detail, defendant admitted to killing both Helsby and Engelhaupt. He did so during his statement to police and again during his testimony at trial. And although he claimed he "snapped" during both, his accounts of the killings provided the strongest evidence of his having made a cold and calculated decision to kill both victims. Defendant has not persuaded this court that informing the jury he agreed to take a polygraph examination before confessing to the murders would have harmed him in any way.

We conclude there is no reasonable probability of a different outcome had defense counsel objected to the prosecutor's statement informing the jury defendant agreed to take a polygraph examination.

V

*Dueñas Claim*

In a supplemental brief filed with this court's permission following the Second Appellate District's recent decision in *Dueñas*, *supra*, 30 Cal.App.5th 1157, defendant argues imposition of the following fines and fees violated his constitutional rights because the trial court did not determine his ability to pay before imposing them: (1) a restitution fine of $10,000 (§ 1202.4); (2) a court operations assessment of $120 (§ 1465.8); (3) a court facilities assessment of $90 (Gov. Code, § 70373); (4) a jail booking fee of $151 (Gov. Code, § 29550.2, subd. (a)); and (5) a fee of $250 for preparation of the probation report (§ 1203.1b, subd. (a)).

We conclude defendant's challenge to the restitution fine, jail booking fee, and probation report fee are forfeited. Assuming, without deciding, his challenges to the other fines and fees have not been forfeited, we conclude *Dueñas* was wrongly decided and therefore reject defendant's claim on that basis.

24

## A.

### *Dueñas*

In *Dueñas*, the defendant (Dueñas) was an indigent and homeless young mother with cerebral palsy who pleaded no contest to driving with a suspended license, a crime she committed after losing her license because she was unable to pay certain fines associated with three juvenile citations. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1160-1161.) The trial court placed Dueñas on probation and, among other things, imposed various mandatory fines and fees. (*Id*. at pp. 1161-1162.) Dueñas asked the trial court to set a hearing to determine her ability to pay. (*Id*. at p. 1162.) At the hearing, the trial court found Dueñas lacked an ability to pay but nevertheless confirmed imposition of court facilities and court operations assessments, noting both were "mandatory regardless of Dueñas's inability to pay them," and also confirmed imposition of a restitution fine in the minimum amount, finding "Dueñas had not shown the 'compelling and extraordinary reasons' required by statute (. . . § 1202.4, subd. (c)) to justify waiving this fine." (*Id*. at p. 1163.) The trial court also rejected Dueñas's constitutional arguments that due process and equal protection prohibited imposition of these fines and fees without a determination that she possessed the ability to pay them. (*Ibid*.)

Our colleagues at the Second Appellate District reversed. With respect to the court facilities and court operations assessments, the court held, "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes [these] assessments." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The court noted the constitutional guarantees of due process and equal protection prohibit a state from "inflict[ing] punishment on indigent convicted criminal defendants solely on the basis of their poverty." (*Id*. at p. 1166, citing *Griffin v. Illinois* (1956) 351 U.S. 12, 17 [100 L.Ed. 891] (*Griffin*).)

With respect to the minimum restitution fine, the court held imposition of this fine without first determining ability to pay, while done in accordance with the statutory

25

scheme, also violated due process; execution of such a fine "must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) The court noted the restitution fine is recognized to be "additional punishment for a crime" and concluded the statutory prohibition on considering ability to pay when imposing the minimum fine is fundamentally unfair because it "punishes indigent defendants in a way that it does not punish wealthy defendants." (*Id.* at pp. 1169-1170.)

**B.**

### *Forfeiture*

"[I]t is of course a familiar rule that appellate courts will not review errors to which an objection could have been, but was not, made in the trial court." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1309.) This rule applies to appellate challenges to the imposition of fines and fees, including those based on the trial court's failure to determine the defendant's ability to pay, and those based on the claimed inadequacy of the record to support such a determination. (See, e.g., *People v. McCullough* (2013) 56 Cal.4th 589, 597 (*McCullough*) [defendant's failure to object to booking fee based on ability to pay forfeits claim that the record did not establish such ability]; *People v. Avila* (2009) 46 Cal.4th 680, 729 (*Avila*) [defendant's failure to adduce evidence of inability to pay maximum restitution fine forfeits challenge to trial court's implied finding he possessed ability to pay that amount]; *People v. Crittle* (2007) 154 Cal.App.4th 368, 371 [defendant's failure to object to a crime prevention program fine forfeits the claim that the trial court failed to consider his ability to pay the fine, and that the record did not support such an ability].)

There is presently a split of authority with respect to whether or not a defendant who did not object to the trial court's imposition of mandatory fines and fees based on inability to pay, like defendant in this case, forfeits a *Dueñas* claim. (Compare *People v. Frandsen* (2019) 33 Cal.App.5th 1126 (*Frandsen*) [finding forfeiture] with *People v.*

26

*Castellano* (2019) 33 Cal.App.5th 485 (*Castellano*) [no forfeiture].) We conclude defendant's challenge to the restitution fine, jail booking fee, and probation report fee are forfeited and decline to address the forfeiture issue with respect to the remainder of his *Dueñas* claim because, even if properly preserved for review, there was no constitutional violation.

Beginning with the restitution fine, as previously mentioned, section 1202.4 allows consideration of a defendant's ability to pay when determining whether to increase the restitution fine above the statutory minimum. (§ 1202.4, subd. (c).) That statutory minimum is $300. (§ 1202.4, subd. (b)(1).) Here, the trial court imposed a restitution fine in the amount of $10,000, the statutory maximum. Thus, defendant could have objected to this fine based on inability to pay but failed to do so, forfeiting his challenge to this fine on those grounds in this appeal. (See *Avila*, *supra*, 46 Cal.4th at p. 729; *Frandsen*, *supra*, 33 Cal.App.5th at p. 1153; see also *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1032-1033.)

Also forfeited are defendant's challenges to the jail booking fee and probation report fee. Government Code section 29550.2, providing for the jail booking fee, states in relevant part: "*If the person has the ability to pay*, a judgment of conviction shall contain an order for payment of the amount of the criminal justice administration fee [(including the costs of booking and classification)] by the convicted person . . . ." (Gov. Code, § 29550.2, subd. (a), italics added.) As previously stated, in *McCullough*, our Supreme Court held the defendant's failure to object to the booking fee based on ability to pay forfeited the claim that the record did not establish such ability. (*McCullough*, *supra*, 56 Cal.4th at p. 597.) Similarly, in *People v. Neal* (2018) 29 Cal.App.5th 820, our colleagues at the First Appellate District held the defendant's failure to object to the probation report fee forfeited that claim on appeal. (*Id*. at p. 824, fn. 4, citing *People v. Valtakis* (2003) 105 Cal.App.4th 1066 [challenge to probation services fee forfeited]; see also *People v. Trujillo* (2015) 60 Cal.4th 850, 860, citing *Valtakis* with approval.)

27

Because there was a statutory basis for objecting to both the jail booking fee (Gov. Code, § 29550.5, subd. (a)) and the probation report fee (§ 1203.1b, subd. (a)) on ability to pay grounds, defendant's failure to do so forfeits these claims on appeal.

Turning to the remainder of defendant's *Dueñas* claim, we note that in *Frandsen*, the appellate court rejected the defendant's argument that his challenge to the court facilities and court operations assessments was not forfeited because an objection to these assessments based on inability to pay would have been futile prior to *Dueñas*, an argument accepted by a different division of that same court in *Castellano*. (Compare *Frandsen*, *supra*, 33 Cal.App.5th at p. 1153 with *Castellano*, *supra*, 33 Cal.App.5th at p. 489.) We need not weigh in on this forfeiture issue here because, even assuming the remainder of this claim is properly preserved for review, there was no constitutional violation.

## C.

### *No Constitutional Violation*

Reactions to the new constitutional principle articulated in *Dueñas* have been mixed. Although many courts have followed its reasoning, others have distinguished (see *People v. Caceres* (2019) 39 Cal.App.5th 917) or disagreed with the opinion (see *People v. Hicks* (2019) 40 Cal.App.5th 320 (*Hicks*), review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1068). The analysis of *Dueñas* in *Hicks* is adopted in *People v. Kingston* (2019) 41 Cal.App.5th 272 at pages 279-281. We join the latter group and limit our discussion of the matter to rejecting *Dueñas* outright.

In *Hicks*,[3] our colleagues at the Second Appellate District rejected the *Dueñas* court's reliance on "two strands of due process precedent" in "fashioning" a new constitutional principle requiring an ability to pay determination before imposing the fine

---

[3] Pursuant to California Rules of Court, rule 8.1115(e)(1), we cite and discuss *Hicks* solely for its "persuasive value."

28

and assessments challenged therein.  (*Hicks*, *supra*, 40 Cal.App.5th at p. 326, rev. granted.)  The first strand, starting with *Griffin*, *supra*, 351 U.S. 12, 17 [100 L.Ed. 891], "secures a due process-based right of *access* to the courts."  (*Hicks*, p. 325.)  This strand of precedent, however, "does not dictate *Dueñas*'s bar on imposing fees because the imposition of assessments, fines and fees does not deny a criminal defendant access to the courts."  (*Id*. at p. 326.)  The second strand of due process precedent relied upon by the *Dueñas* court "erects a due process-based bar to incarceration based on the failure to pay criminal penalties when that failure is due to a criminal defendant's indigence rather than contumaciousness."  (*Hicks*, at p. 325, citing *In re Antazo* (1970) 3 Cal.3d 100, 103-104, 113-114 & *Bearden v. Georgia* (1983) 461 U.S. 660, 661-662 [76 L.Ed.2d 221].)  This strand "also does not dictate *Dueñas*'s bar on imposing fees because their imposition, without more, does not result in incarceration for nonpayment due to indigence."  (*Id*. at p. 326.)

We agree with the *Hicks* analysis in its entirety.  The strands of precedent relied upon by the *Dueñas* court in expanding due process protections to require an ability to pay determination before imposing a mandatory fine, fee, or assessment do not support, and indeed run contrary to, such an expansion.  Imposition of the challenged financial obligations has not deprived defendant of access to the courts.  Nor has defendant been incarcerated because of his inability to pay.  Rather, he is incarcerated because he committed two murders (and unauthorized taking or driving a vehicle).  He was sentenced to serve two consecutive terms of life without the possibility of parole for these two murders and will have an opportunity to attempt to pay these obligations, e.g., from prison wages if he obtains employment while in prison.  (See *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
MURRAY, Acting P. J.

/s/
RENNER, J.